

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*Jacob K. Javitz Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 23, 2024

**BY ECF**
The Honorable Naomi Reice Buchwald
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: *United States v. Michael Amaya, a/k/a "Miz,"* S8 22 Cr. 10 (NRB)

Dear Judge Buchwald:

      The Government respectfully submits this letter in advance of the September 26, 2024 sentencing of Michael Amaya, a/k/a "Miz" (the "defendant"), and in response to the defendant's September 16, 2024 sentencing submission. (Dkt. 217 ("Def. Mem.")).

      As described further below, the defendant managed a drug trafficking organization (the "DTO") that was responsible for distributing a staggering amount of deadly fentanyl-laced heroin in the Bronx between approximately 2019 and December 2021, when the defendant was arrested in the instant case. During that time, and despite knowing the deadly effects of the DTO's product, the defendant worked hand-in-hand with the leader of the DTO, co-defendant Jesus Cabrera, to ensure that the DTO's daily operations ran smoothly so that the DTO could bring in hundreds of thousands of dollars in profits. Drug wholesalers looking to resell the DTO's product and drug users battling addiction came from all over the Bronx and lined up down the block to buy the DTO's potent product from the DTO's street level dealers, whose drug sales were managed and overseen by the defendant and protected by armed members of the DTO.

      All the while, the Bronx community in which the DTO operated suffered. In 2021 alone, the DTO's signature "Supreme"-stamped glassines were recovered from the scenes of <u>eight</u> fatal fentanyl-related poisonings in the Bronx, including that of Malik Rahman ("Rahman"), who died in August 2021 shortly after consuming the DTO's product and whose death the defendant has stipulated was caused by the very drug conspiracy he managed and oversaw. Then, in December 2021, after a series of arrests and overdoses brought law enforcement scrutiny onto the DTO, the defendant and Cabrera decided to change the stamps they used to market the DTO's product—a step they took to continue making money at the expense of the victims and families affected by the DTO's drug dealing and the opioid epidemic in this country.

      The defendant's conduct was abhorrent and must be met with significant consequences. While the Government recognizes that the defendant has no prior criminal convictions, which in the ordinary course and in combination with other mitigating factors not present here, might

counsel in favor of a below Guidelines sentence, the Section 3553(a) factors in this case weigh heavily in favor of a sentence within the Guidelines range. Accordingly, and as set forth below, the Government respectfully submits that a sentence within the Guidelines range of 292 to 365 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

### I. Background on Fentanyl

As the Court is aware, the United States is in the midst of an opioid crisis that has tragically taken tens of thousands of lives, driven primarily by synthetic opioids such as fentanyl. According to the DEA, "fentanyl is the single deadliest drug threat our nation has ever encountered."[1] Because of its potency and low cost, fentanyl is often mixed with other drugs, such as heroin and cocaine, in order to increase the potency of those drugs, which, in turn, increases the likelihood of a fatal interaction for a drug user who did not know that the drugs they were purchasing were laced with fentanyl. Mixing other narcotics with fentanyl is not an exact science and as little as two milligrams of fentanyl can be lethal depending on the person's body size, tolerance, and past usage. Fentanyl analogues—which are chemical variations of fentanyl—are often even more potent.

The number of overdose deaths linked to synthetic opioids, such as fentanyl, during the period of the charged conspiracy is harrowing. Indeed, according to the Centers for Disease Control and Prevention (the "CDC"), out of approximately 107,543 deaths from drug overdoses in this country in 2021, it is estimated that 80,590 of these deaths, or 75%, resulted from synthetic opioids (primarily fentanyl).[2] In New York City alone, there were approximately 2,668 fatal overdoses in 2021, an increase of approximately 500 over the 2020 figure and 1,100 over the 2019 figure.[3]

The number of overdose deaths associated with fentanyl poisonings continue to reflect the devastating effects of this deadly drug. For example, in 2023, there were an estimated 107,543 drug overdose deaths in the United States, with approximately 74,702 deaths resulting from fentanyl.[4] Moreover, and to make matters worse, the tens of thousands of lives lost to fentanyl reflect only a portion of the damage that this drug has caused in recent years, as those numbers do not account for the impact that these fentanyl-related poisonings, and opioid addiction generally, have on the families and loved ones of the victims whose lives are cut short by fentanyl, and on the community as a whole.

---

[1]   *See* https://www.dea.gov/stories/2023/2023-02/2023-02-08/overdose-death-investigations-challenge-dea-agents-bring-justice (last accessed Sept. 22, 2024).

[2]   *See* https://www.cdc.gov/washington/testimony/2022/t20220726.htm (last accessed Sept. 22, 2024).

[3]   *See* https://www.nyc.gov/assets/doh/downloads/pdf/epi/databrief133.pdf (last accessed Sept. 22, 2024).

[4]   *See* https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2024/20240515.htm#:~:text= Provisional%20data%20from%20CDC%27s%20National,111%2C029%20deaths%20estimated %20in%202022 (last accessed Sept. 22, 2024).

## II. Offense Conduct[5]

### A. Overview of the DTO

As set forth in the PSR, from in or around 2019 to in or around February 2022, the DTO operated from 142nd Street between Brook Avenue and St. Ann's Avenue (the "Set") in the Bronx and sold fentanyl-laced heroin on a near-daily basis. The DTO sold its poison to the public, both to individual drug users and in bulk to wholesale drug dealers who re-distributed the DTO's product in other areas of the Bronx. To market and distinguish its product, the DTO placed a signature "stamp" (or logo) on its glassines. As described further below, that stamp was changed from "Supreme" to "Off White" to "Thriller," in response to law enforcement scrutiny on the DTO's operations.

The DTO sold a massive amount of fentanyl-laced heroin. In late 2021, for example, in the months preceding the defendant's arrest in the instant case, the DTO sold around five to six kilograms of fentanyl-laced heroin per month—enough fentanyl, as described above, to potentially kill millions of people. Indeed, and as noted above, in 2021 alone, there were eight confirmed fatal overdoses in the Bronx in which the DTO's "Supreme" stamped glassines were found at the scenes. The DTO also used guns to protect its operation, with certain DTO members carrying guns to ensure that other DTO members were not robbed.

Each member in the DTO had an assigned role, and the defendants charged in the instant case were the most central figures in the DTO. Co-defendant Jesus Cabrera was the leader of the DTO. The defendant served as Cabrera's lieutenant or manager, overseeing the DTO's various workers on the Set, including dealers, lookouts, and armed security. In that role, the defendant made sure that the DTO's dealers were supplied with drugs every morning at around 6:00 a.m., monitored their progress throughout the day, re-supplied them as necessary, and, at the end of the day, collected the DTO's profits and reported them to Cabrera. Co-defendants Alberto Concepcion, a/k/a "Chino" ("Concepcion"), Luis Ramirez, a/k/a "Flaco Construction," a/k/a "Lou" ("Ramirez"), and Jose Figueroa, a/k/a "Chelo" ("Figueroa"), primarily served as street-level dealers who distributed the DTO's drugs on and in the vicinity of the Set. Co-defendant Willie Harris, a/k/a "Light" ("Harris"), provided armed security on the Set and served as a dealer and lookout. And co-defendants Frankie Capellan, a/k/a "Nitty" ("Capellan"), and Humberto Borges, a/k/a "Berto" ("Borges"), were "baggers," meaning they worked with Cabrera to package the DTO's drugs at their apartments for sale on the Set.

### B. The Defendant's Conduct

The defendant has been dealing drugs with Cabrera since at least in or around early 2019. While the defendant argues in his sentencing submission that he only became involved in the charged conspiracy after the onset of the COVID-19 pandemic in 2020, (*see* Def. Mem. at 13-14), text messages from the defendant's iCloud account support that his drug dealing with Cabrera began much earlier. For example, the defendant's iCloud account reflects that, through 2019, the

---

[5] Unless otherwise noted, the facts set forth in this section are reflected in the PSR.

defendant and Cabrera exchanged hundreds of text messages using coded language that appear to refer to their drug dealing, including text messages in which the defendant appeared to be updating Cabrera on the quantity of drugs that had been sold, what remained to be sold, and the nicknames of individuals buying the drugs. During those conversations, the defendant and Cabrera remained vigilant of potential law enforcement activity. For example, in March 2019, the defendant told Cabrera, "I been spooked all morning cuz they hit 535 this morning," an apparent reference to law enforcement having searched a particular location.[6]

The defendant's relationship with Cabrera grew over time and he became Cabrera's go-to lieutenant to manage the DTO's operations in 2020 and 2021. In this role, the defendant supervised the various street-level dealers on the Set, including by arriving early every morning with narcotics to sell, facilitating the resupply of the dealers during the day, and collecting money from the dealers at the end of the day. The defendant constantly apprised Cabrera of drug sales on the Set and frequently called Cabrera to confirm particular drug sales. In fact, on an almost daily basis, the defendant provided real-time updates to Cabrera about the DTO's operations and communicated directly with other members of the DTO about their drug sales and drug supply. The number of communications the defendant had with members of the DTO was astronomical. For example, toll records reflect that, between August and December 2021 alone, Cabrera and the defendant were in contact, by text message or phone call, *over 8,000 times*. The text message communications between Cabrera and the defendant were constant and underscored the significant amounts of narcotics that the DTO was distributing, as well as their profits, which sometimes exceeded $100,000. For example, on November 7, 2021, in the middle of numerous text messages about the amounts of narcotics being distributed to various DTO dealers and customers, Cabrera texted the defendant, "$128,375 so far."

While working with the DTO, and prior to his arrest in the instant case, the defendant was arrested twice. On both occasions, he was found to be in possession of significant quantities of drugs. On or about November 21, 2020, NYPD officers in an unmarked patrol vehicle observed the defendant driving his Audi SUV in the Bronx with illegally tinted windows. The NYPD officers pulled the defendant over and observed a jar of suspected marijuana in plain view in the back seat of the Audi, a bag full of United States currency behind the front passenger seat, and a second bag on the front passenger seat filled with rice and glassines of suspected heroin. During the inventory search of the defendant's Audi, the NYPD found, among other things, approximately 2,180 glassines of suspected heroin, approximately 16 clear zip-lock bags of suspected cocaine, additional marijuana, and over $50,000 in United States currency. The glassines of suspected heroin were later tested by an NYPD laboratory and found to consist of approximately 124 grams of mixtures and substances containing a detectable amount of fentanyl. The defendant was charged with state narcotics offenses and released on bail. A photograph of the items recovered from the defendant's Audi SUV in November 2020 is below:[7]

---

[6] The facts in this paragraph were not included in the PSR; however, the Government produced the contents of the defendant's iCloud account to the defense in connection with Rule 16 discovery.

[7] The NYPD vest depicted in the photograph was not recovered from the defendant's vehicle.



Undeterred by his November 2020 arrest, and while out on bail, the defendant continued to engage in drug dealing with the DTO. On or about July 7, 2021, the NYPD observed the defendant engage in a hand-to-hand drug transaction from his Audi SUV. Law enforcement officers then approached the Audi and placed the defendant under arrest. Approximately 200 zip-lock bags containing suspected cocaine were found in the defendant's pants. A subsequent search of the defendant's Audi SUV resulted in the seizure of 33 glassines of suspected heroin and over $22,000 in United States currency. A subset of the zip-locks bags and one of the glassines were tested by an NYPD laboratory. The zip-lock bags tested positive for cocaine and the glassine tested positive for fentanyl and fentanyl analogue. The defendant was charged with state narcotics offenses and released on bail.

Despite these two arrests, and while out on bail, the defendant continued managing the operations of the DTO. Moreover, and in addition to the drug dealing conduct described above, in or around November 2021, the defendant was robbed at gunpoint on the Set, which prompted Cabrera to hire additional armed security to ensure that the DTO's operations would not be hindered.

### C. Overdose Deaths

As described above, the DTO's drug dealing, which was managed by the defendant, led to tragic consequences in the community—consequences that the defendant and Cabrera knew full well could result from the DTO's operations.

One of those tragic consequences was the fatal fentanyl poisoning of Rahman. On August 25, 2021, one of the DTO's dealers, co-defendant Alberto Concepcion, sold "Supreme" glassines containing fentanyl to another individual ("Individual-1"). Later that day, Individual-1 gave one of those glassines to Rahman, who, as confirmed by medical examiners reports, died from an overdose shortly after ingesting the DTO's product. When NYPD officers later conducted a strip-

search of Individual-1, they recovered approximately 30 glassines of "Supreme," which tested positive for fentanyl and para-fluorofentanyl.

The defendant and Cabrera were directly overseeing Concepcion's drug dealing at the time of Rahman's death. In fact, in the days leading up to Rahman's fatal overdose, the defendant and Cabrera exchanged text messages referencing certain quantities of narcotics that they were distributing to Concepcion for resale on the Set, as well as the cut of the over $110,000 in recent DTO proceeds they were going to provide to Concepcion. And on the day of the fatal overdose, text messages between the defendant and Cabrera reflect that Concepcion was selling narcotics for the DTO at the defendant's and Cabrera's direction.

In addition to Rahman's death in August 2021, as set forth in the PSR and in Exhibit A of the defendant's Plea Agreement, from March 2021 until December 2021, while the defendant was managing the DTO's operations, there were seven other confirmed fatal overdoses in the Bronx in which the DTO's "Supreme" stamped glassines were found at the scene. In or around September 2021, Cabrera was asked if he knew whether people had died from overdosing on "Supreme." In response, Cabrera looked up, laughed it off, and said, "na man, people hating, they don't want us making money."

Following these fatal overdoses, and in response to arrests of some of the DTO's street level dealers, Cabrera and the defendant decided to change the stamps that the DTO would use to market its product. In or around December 2021, Cabrera sent the defendant photographs of two logos—"Off White" and "Thriller"—which the DTO later used as stamps to replace "Supreme." In response, the defendant texted Cabrera, in sum and substance, that he preferred the "Off-White" stamp. The DTO then began using an "Off White" stamp and, shortly thereafter, switched to a "Thriller" stamp.

### D. The Defendant's December 2021 Arrest

On or about December 20, 2021, the defendant was charged by Complaint with the conduct underlying the two New York State arrests described above after he had been identified in the Government's investigation as the DTO's day-to-day manager.

In connection with his federal arrest in the instant case, law enforcement seized, among other things, one of the defendant's cellphones that he appeared to use exclusively for managing the DTO's operations. That cellphone contained thousands of text messages reflecting, as described above, that he was managing the DTO on a daily basis, including through regular communications with Cabrera about the same.

While not reflected in the PSR, the defendant's cellphone also contained, among numerous other things, a photograph from September 2021 of a "Supreme"-stamped glassine and a photograph from December 2021 of suspected narcotics proceeds. Those photographs are included below:




### III. Procedural History and Applicable Guidelines Range

Following the defendant's December 2021 arrest in the instant case, the Government continued investigating the DTO. On February 15, 2022, a grand jury in this District returned Superseding Indictment S2 22 Cr. 10 (the "S2 Indictment") charging the central members of the DTO, including the defendant, with conspiracy to distribute 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and, with respect to the defendant, Cabrera, and Concepcion, the charge included an enhanced penalty provision for conspiring to distribute the deadly dose that resulted in Rahman's death. (Dkt. 14). Several of the defendant's co-defendants, including Cabrera, were arrested the following day. During and in connection with those arrests, law enforcement recovered from one of the DTO's stash houses, among other things, significant quantities of fentanyl and detailed drug ledgers. Photographs of some of the items recovered from the stash house are below:



On December 16, 2022, a grand jury in this District returned Superseding Indictment S4 22 Cr. 10 (the "S4 Indictment") containing the same charges as the S2 Indictment, and also charging the defendant, Cabrera, Concepcion, and Harris with using and carrying a firearm during and in relation to the narcotics conspiracy, in violation of 18 U.S.C. §§ 924(c). (Dkt. 69).

On May 30, 2024, shortly before trial was scheduled to commence, the defendant pled guilty, pursuant to a plea agreement (the "Plea Agreement") to conspiring to distribute or possess with intent to distribute (i) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and (ii) mixtures and substances containing a detectable amount of para-fluorofentanyl, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). In the Plea Agreement, the defendant stipulated that the substances the defendant conspired to distribute resulted in the death of Malik Rahman. (*Id*.). The defendant further agreed, in Exhibit A to the Plea Agreement, that he would not contest that (i) the defendant was the manager of the DTO; (ii) the DTO distributed at least 36 kilograms and more of mixtures and substances containing a detectable amount of fentanyl; and (iii) "Supreme"-stamped glassines were recovered from the scenes of seven other fatal fentanyl-related overdoses in the Bronx in 2021.

In the Plea Agreement, the parties stipulated to an offense level of 40 and a Criminal History Category of I, yielding a stipulated Guidelines range of 292 to 365 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment.

Probation's Guidelines calculation is in accord with the parties' Plea Agreement. Probation has recommended a sentence of 216 months' imprisonment, taking into account the defendant's lack of criminal history, difficult upbringing, and military service, as mitigating factors. (PSR at 32-33). The defendant asks that the Court to impose the mandatory minimum sentence of 120 months' imprisonment, principally based on the defendant's lack of criminal history, upbringing, and familial support. (*See generally* Def. Mem.)

## IV.    The Court Should Impose a Sentence Within the Guidelines Range

The Government respectfully submits that a sentence within the Guidelines Range of 292 to 365 months' imprisonment would be sufficient, but not greater than necessary, to reflect the nature and seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

### A.  Nature and Seriousness of the Offense

The nature and seriousness of the offense cannot be overstated. The defendant was the manager of a DTO that distributed jaw-dropping quantities of deadly fentanyl into the community. As set forth in the PSR, and agreed to in the Plea Agreement, the DTO is being held responsible for distributing at least 36 kilograms of fentanyl. But that number does not capture the breadth and volume of the DTO's drug trafficking. As reflected in the PSR, in the latter half of 2021 alone, the DTO distributed approximately 5 to 6 kilograms of fentanyl *per month*. That average monthly quantity, calculated over just a one-year period, results in the distribution of approximately 60 to

72 kilograms—enough fentanyl to ravage New York City for years to come and place the defendant well-above the highest bracket of the Guidelines Drug Quantity Table. Indeed, few cases involve the vast quantities of fentanyl distributed by the DTO. By way of example, in fiscal year 2023, only approximately 8% of the 18,639 cases involving the application of U.S.S.G. 2D1.1 included, as this case does, a base offense level of 38.[8] The sheer quantity of fentanyl that the defendant conspired to distribute with the DTO thus alone justifies a substantial term of imprisonment.

Beyond the drug quantity, the defendant's specific role as the manager of the DTO, coupled with his knowledge of the potential deadly effects of fentanyl, further justify a Guidelines sentence. As described above, the defendant was intimately involved in the DTO's operations and integral to its success. Far from being a low-level dealer or interchangeable member of the DTO, the defendant held a position of trust and leadership within the DTO, responsible for managing the DTO's drug dealers, ensuring that they were supplied with sufficient quantities of drugs on a daily basis, collecting and handling hundreds of thousands of dollars in drug proceeds, and coordinating all of the DTO's operations with Cabrera. Put simply, there was not an aspect of the DTO's street-level operations that the defendant did not play a significant role in facilitating. That included making sure that the DTO's drug dealers had massive quantities of drugs to sell every day and that they were protected by armed members of the DTO who served as lookouts on the block.

In addition to the defendant's central role in the DTO's operations, the defendant's knowledge of the potential deadly effects of fentanyl—and his blatant disregard for the risks associated with his drug dealing—further exacerbate his conduct and underscore the need for a Guidelines sentence. As the Court recognized at the sentencing of co-defendant Jose Figueroa, who was sentenced to 120 months' imprisonment, "people who deal in these drugs know that someone will die from them." Dkt. 206 at 21. Here, there is no need to conclude based on inferences that the defendant was aware of the deadly effects of fentanyl. In or around January 2019, Cabrera sent the defendant a link to a news article that described law enforcement's crackdown on heroin dealers in the South Bronx who were "pushing a deadly cut of heroin . . . using a new drug known as fentanyl" that was leading to fatal overdoses.[9] And when overdoses and arrests led to law enforcement scrutiny on the DTO, the defendant and Cabrera went so far as to change the stamps on the DTOs product. That action previously led the Court to note that, in this case, knowledge of the potentially deadly impact of fentanyl trafficking "is different for the leaders [of the DTO] because they changed the name on the drugs . . . so that's a different sort of level of knowledge." *Id.*

The harm that the DTO's operations could cause to the community also was not theoretical. As noted above, the DTO's product was found on the scene of <u>eight</u> fentanyl-related poisonings in the Bronx in 2021 alone, including that of Malik Rahman. But for the DTO's drug dealing on August 25, 2021, which the defendant was managing and overseeing along with Cabrera, Rahman might still be alive today. And while the defendant was only charged with, and has accepted

---

[8] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2023/Ch2_Guideline_FY23.pdf.

[9] *See* https://pix11.com/news/local-news/bronx/nypd-cracking-down-on-heroin-in-the-bronx/.

responsibility for his role in, Rahman's death, it is undisputed that numerous other victims also died of fentanyl-related poisonings and that the DTO's product was found at the scene of those deaths, as set forth in Exhibit A of the Plea Agreement. The defendant's actions in this case thus led to the most serious and tragic of consequences: the loss of human life. And despite knowing full well the risks associated with continuing to sell fentanyl with the DTO, the defendant and Cabrera doubled down in their efforts to keep their operation profitable and undetected by law enforcement by changing the stamps. That conduct, and the tragic and fatal effects of the DTO's operations, are thus undoubtedly aggravating factors that further support a Guidelines sentence.

Accordingly, the nature and seriousness of this offense strongly support the imposition of a Guidelines sentence.

### B. History and Characteristics of the Defendant

The history and characteristics of the defendant also call for a substantial sentence. While the Government recognizes that the defendant has no prior criminal convictions, the evidence in this case makes clear that, by the time the defendant was arrested in December 2021 in connection with the instant case, he had been engaged in significant drug trafficking for a period of at least approximately two years. As described above, the defendant was twice arrested in connection with his drug trafficking with the DTO, in 2020 and 2021, and released on bail on both occasions, only to resume his role of managing the DTO's operations. The Government then took over the defendant's open cases from the Bronx District Attorney's Office and charged the defendant by Complaint with the conduct that led to his prior arrests. Thus, the fact that the defendant had not previously sustained criminal convictions because of his drug dealing should not be viewed as a mitigating factor. Instead, the Government respectfully submits that the Court should consider the defendant's continuous and pervasive drug dealing with the DTO as another factor supporting a Guidelines sentence in this case.

Moreover, while the defendant has faced some difficult circumstances, he has had ample opportunity to lead a law-abiding life. As set forth in the PSR, the defendant was raised by his mother and, after graduating high school, enlisted in the U.S. military and was deployed overseas. Following his deployment, the defendant attended college courses and held various lawful jobs up until approximately 2020. While the Government recognizes that the defendant has at times struggled, including as a result of his time in the military, the defendant had every opportunity to do the right thing and not break the law. He chose to do the opposite. And while the defendant now claims that the COVID-19 pandemic and the resultant financial struggles that he faced caused him to participate in the charged conspiracy, the evidence from the defendant's iCloud account showing his drug dealing with Cabrera throughout 2019 belies that assertion. The Court should therefore give no weight to the defendant's argument that financial struggles led him to make an uncharacteristically bad decision that resulted in the instant conviction.

It is also noteworthy that the defendant engaged in the charged conduct while in his late thirties. This is not a case in which a young adult made a one-time bad decision to engage in criminal conduct. Nor is this a case in which the defendant was addicted to drugs and only sold drugs to fuel his addiction. The defendant—a former member of the U.S. military with an

education, a supportive family, and experience working lawful jobs—knew full well that this continuous criminal conduct could result in grave consequences not only to him and the community, but to his loved ones and those who depend on him.  The defendant disregarded those risks and chose to sell massive amounts of poison for his own financial gain.  Thus, while the Government recognizes that a Guidelines sentence will have serious consequences for not only the defendant, but, sadly, for his family and friends, the defendant has no one to blame but himself for those consequences.

### C. The Need to Afford Deterrence, Protect the Public, and Promote Respect for the Law

The need to afford adequate deterrence, protect the public from other crimes of the defendant, and promote respect for the law also support the imposition of a Guidelines sentence.

With respect to deterrence, the defendant was managing a massive drug operation even while out on bail following two separate drug-related arrests.  Clearly, those arrests did not deter the defendant from disregarding the law—and his bail conditions—to jump right back into managing the DTO's operations.  The need for specific deterrence thus rings loudly in this case.  As described above, although the defendant had every chance to lead a law-abiding life, when presented with the opportunity to make significant amounts of money by dealing drugs, the defendant jumped at the opportunity and became a trusted partner of Cabrera.  In his role as the manager of the DTO, the defendant learned the ins and outs of the drug trafficking world and was entrusted with handling significant quantities of drugs and cash.  The defendant thus has the skills he needs to resume drug trafficking after he completes any sentence imposed by the Court.  A significant sentence is thus necessary to deter the defendant from engaging in further crime in the future and, in turn, to protect the public from future crimes of the defendant.  And with respect to general deterrence, a Guidelines sentence would send a strong message that drug trafficking, particularly when it involves fentanyl, the loss of life, and the use of firearms, will not be tolerated, and that engaging in that type of conduct will lead to substantial prison time.

Relatedly, and just as important, is the need to promote respect for the law.  The opioid epidemic has caused untold harm to this country and to New York City.  The defendant's conduct in this case, and that of his co-conspirators, undoubtedly helped fuel that pain and tragedy.  A Guidelines sentence would promote respect for the rule of law by ensuring that those who, like the defendant, choose to profit from addiction and tragedy by breaking the law are held fully accountable.

### D. Relative Culpability

Finally, a Guidelines sentence would be in line with the other sentences imposed in this case to date based on the defendant's relative culpability.  The Government views the defendant as the second most culpable member of the DTO, behind only Cabrera, the DTO's leader.

A table reflecting the Government's view on relative culpability among charged defendants, and the sentences the Court has imposed to date, is below:

| Defendant | Primary Role in DTO | Charged with Role in Rahman Death | Sentence |
|---|---|---|---|
| **Tier 1** | | | |
| Jesus Cabrera | Leader | X | |
| **Tier 2** | | | |
| Michael Amaya | Manager | X | |
| **Tier 3**[10] | | | |
| Humberto Borges | Bagger | | |
| Frankie Capellan | Bagger | | 120 months |
| Alberto Concepcion | Dealer | X | |
| Willie Harris | Security / Dealer | | 144 months |
| Luis Ramirez | Dealer | | |
| **Tier 4** | | | |
| Jose Figueroa | Dealer | | 120 months |

As reflected above, the three co-defendants sentenced to date are, in the Government's view, less culpable than the defendant and received sentences of 120 months' and 144 months' imprisonment. While those co-defendants each had significant criminal histories, they also had certain mitigating circumstances that are not present here. And unlike the defendant, none of those defendants was charged with Rahman's death. Moreover, the Government views Cabrera and the defendant as very differently situated from a leadership perspective than the other charged co-defendants—a view that is reflected by the fact that, unlike the defendant and Cabrera, none of the defendants sentenced to date stipulated to a leadership enhancement in their plea agreements. As described above, Cabrera and the defendant made sure that the DTO, as a whole, was able to carry out its operations on a daily basis. No other charged defendants shared the level of responsibility that the defendant and Cabrera had in the DTO, which, in addition to being responsible for Rahman's death, is also a significant aggravating factor that supports a Guidelines sentence.

Accordingly, a Guidelines sentence of 292 to 365 months' imprisonment would account for the defendant's relative culpability among co-defendants sentenced to date and would not lead to unwarranted sentencing disparities.

---

[10] The Government views each of the defendants within Tier 3 as being similarly culpable, as they played different but important roles in the DTO.

## V. Conclusion

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence of 292 to 365 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Matthew King / Kaylan Lasky / David Robles
Assistant United States Attorneys
(212) 637-2384 / 2315 / 2550

cc: Javier Solano, Esq. (by ECF)
    Michael Kushner, Esq. (by ECF)